IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Alice F. Mann, ) | |
| Plaintiff, ) | Civil Action No. 6:05-3508-JFA-WMC |
| ) | |
| vs. ) | **REPORT OF MAGISTRATE JUDGE** |
| ) | |
| Jo Anne B. Barnhart, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income (SSI) benefits under Title XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff previously protectively filed an application for SSI benefits on October 13, 1995, alleging disability commencing January 13, 1995. The claim was denied at all administrative levels, including an unfavorable ALJ decision issued on May 30, 1997. The plaintiff requested review of the decision on August 1, 1997, and the Appeals Council denied the plaintiff's request on June 25, 1998. A civil action was filed on July 30, 1998

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

(C.A. 6:98-2234-JFA-WMC).  By order of the Honorable Joseph F. Anderson, Jr., now Chief United States District Judge, on August 17, 1999, the Commissioner's decision was affirmed.

The plaintiff protectively filed her next application for SSI benefits on September 17, 1997, alleging disability commencing January 13, 1995.  The claim was denied initially on July 7, 1998, and was not pursued.

The plaintiff protectively filed her next application for SSI benefits on June 29, 1998, alleging disability beginning January 13, 1995.  The claim was denied at all administrative levels, including an unfavorable ALJ decision issued on April 27, 2000.  The plaintiff requested review of the decision on June 7, 2000, and the Appeals Council denied the plaintiff's request on October 10, 2001.  A civil action was filed, and the claim was dismissed by consent order filed June 16, 2002.

The plaintiff filed her current application for SSI benefits on November 9, 2001.  The application was denied initially and on reconsideration by the Social Security Administration.   On December 19, 2002, the plaintiff requested a hearing.   The administrative law judge, before whom the plaintiff, her attorney and a vocational expert appeared, considered the case *de novo*, and on August 25, 2004, found that the plaintiff was not entitled to benefits.   The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on November 25, 2005.  The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1)    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> (2)     The claimant's history of an aneurysm and depression are considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

2

(3)    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, of Regulation No. 4.

(4)    The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

(5)    The claimant has the residual functional capacity to perform work with restrictions including lifting and/or carrying 20 pounds occasionally, 10 pounds frequently; simple, routine work in a low stress environment (which I define as requiring few decisions); only occasional interaction with the public; occasional balancing, stooping, kneeling, crouching, and crawling, no climbing of ladders, ropes, or scaffolds; avoidance of hazards such as unprotected heights, vibration, and dangerous machinery; and an environment free from poor ventilation, dust, fumes, gases, odors, humidity, wetness, and temperature extremes.

(6)    The claimant is unable to perform any of her past relevant work or has no past relevant work experience (20 CFR § 416.965).

(7)    The claimant is a "younger individual between the ages of 45 and 49" (20 CFR § 416.963).

(8)    The claimant has "a limited education" (20 CFR § 416.964).

(9)    The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 416.968).

(10)    The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

(11)    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as assembler, 5,090 jobs locally, 1 million plus nationally; packager, 3,740 jobs locally, 680,000 nationally; and inspector, 3,100 locally, 625,000 nationally.

(12)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

3

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie

4

showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **FACTS PRESENTED**

The plaintiff alleged a disability onset date of January 13, 1995 (Tr. 97); however, the relevant time period for this case begins April 28, 2000, one day after the prior unfavorable ALJ decision on her third application[2] (Tr. 35). The plaintiff was 45 years old on April 28, 2000, and 49 years old on the date of the ALJ's decision (Tr. 91). She has an eighth-grade education (Tr. 39, 103) and no past relevant work (Tr. 66, 98). The plaintiff alleged disability due to brain aneurysm, headaches, depression, dizziness, fatigue and weakness (Tr. 97). She later alleged that ulcers and depression contributed to her disability (Tr. 52-53, 57).

With regard to the plaintiff's ulcer complaints, an endoscopy of the plaintiff's esophagus in August 2000 revealed mild gastritis and some inflammation, but no frank ulcer (Tr. 129-30). On November 2, 2000, Dr. T. Bright Williamson noted that the plaintiff was "getting along pretty well" on Aciphex (Tr. 129). An endoscopy of the plaintiff's esophagus on March 12, 2001, was negative (Tr. 131).

As to the plaintiff's other complaints, the plaintiff presented to nurse practitioner Susan Dean in October 2000 for headaches, triggered by stress and smells. The plaintiff reported doing "a little bit better," and that Paxil helped her mental symptoms. Ms. Dean prescribed Zomig and Calan for headaches. Ms. Dean subsequently prescribed additional medications (Tr. 133-34).

On March 28, 2001, Ms. Dean noted that the plaintiff had problems with depression/anxiety and was treated with counseling and Paxil. She also noted that the plaintiff's headaches had recurred since running out of Calan and prescribed medications (Tr. 132).

---

[2]The ALJ's 4/27/00 decision on the plaintiff's third claim, which related to the same issues, became the final decision of the Commissioner. Therefore, her current claim for benefits is subject to the doctrine of *res judicata* through 4/27/00. *See* 20 CFR §416.1457(c)(1). The plaintiff did not become eligible for SSI payments until one month after the date she filed her current SSI application (11/9/01). *See* 20 CFR §416.335.

In January 2002, the Pee Dee Mental Health Center completed forms indicating the plaintiff had been treated there since May 2000 for major depressive disorder, treated with Paxil and Remeron. The records indicated the plaintiff had "improved since the early days of treatment," and that she attended group therapy and support "when her schedule allowed" (Tr. 144).

On February 28, 2002, Dr. Anthony Carraway performed a consultative examination in connection with the plaintiff's application for benefits. Mental status examination revealed the plaintiff had logical, goal-directed and well-organized thoughts; no thought disorder; no hallucinations; no delusions; no homicidal or suicidal ideations; and mild to moderate memory impairment. Dr. Carraway assessed a single episode of mild to moderate major depression and a Global Assessment of Functioning (GAF) score of 58[3] (Tr. 135-37).

In March 2002, Hubert Eaker, Ph.D., a State agency psychologist, reviewed all of the evidence and completed a psychiatric review technique form. He concluded the plaintiff had "moderate" restrictions in her activities of daily living and abilities to maintain social functioning, concentration, persistence and pace, and no episodes of decompensation of extended duration (Tr. 176). Dr. Eaker also completed a mental residual functional capacity assessment and found the plaintiff was "moderately" limited in her abilities to understand, remember, and carry out detailed instructions; maintain concentration for extended periods; interact appropriately with the general public; and set realistic goals. He concluded the plaintiff was "not significantly limited" in all other areas of work-related mental functioning. Overall, Dr. Eaker found the plaintiff "may have difficulty attending to detailed work but is able to carry out simple work directions - she can persist

---

[3]A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. See American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, 32 (4th ed. 1994). A GAF score is a snapshot of a condition at one point in time, and is not a longitudinal indicator of one's overall level of function. See *id.* at 30-31 (GAF provides an assessment of psychological, social, and occupational functioning at one point in time).

7

on simple tasks for 2+ hour periods w[ithout] special supervision - she can attend work regularly - [she] does not appear suited for interaction [with] the general public but she is able to respond appropriately to supervision - [she] is able to make necessary occupational adjustments but may need assistance in setting appropriate work goals" (Tr. 180-83).

In April 2002, Dr. Charles Lyons, a State agency physician, reviewed all of the evidence and concluded the plaintiff retained the physical residual functional capacity for light work with occasional climbing of ramps/stairs and occasional balancing, stooping, kneeling, crouching and crawling, and no climbing of ladders/ropes/scaffolds (Tr. 158-65).

In October 2002, Dr. Wakes Reston, a State agency physician, reviewed all of the evidence and opined the plaintiff could perform sedentary work, with occasional climbing, balancing, stooping, kneeling, crouching and crawling, and avoidance of even moderate exposure to hazards such as dangerous machinery and heights (Tr. 149-56).

On March 14, 2003, the first time the plaintiff had sought treatment since March 2001, she presented to Dr. Timothy Shaver with complaints of headache, left shoulder and knee pain, trouble swallowing and stomach discomfort. Examination showed cataracts, no crepitus with shoulder or knee motion and a nondistended and nontender abdomen. Dr. Shaver assessed headache, doubt vascular nature; possible osteoarthritis; and dyspepsia. He referred the plaintiff to a neurologist, recommended ibuprofen, and prescribed Ranitidine and an upper GI for her stomach complaints (Tr. 207-09).

On April 16, 2003, Dr. Elizabeth Dickinson performed a consultative examination in connection with the plaintiff's application for benefits. Physical examination revealed the plaintiff had full back, hip, shoulder and knee ranges of motion; normal strength and grip in the hands; full strength in the lower extremities; and a wasting of muscle and fat in her right temple. Neurologically, the plaintiff had intact cranial nerves; normal deep tendon reflexes; and intact sensation. Mental examination showed the plaintiff was alert, fully-oriented, depressed and mildly agitated and had some memory problems.

8

Dr. Dickinson assessed no focal neurologic deficits status post aneurysm repair; wasting of the soft tissue over the right temporal region; headaches; and a major depressive episode. She noted that the plaintiff's main problem was a "lack of emotional stability," and recommended she follow up with a neurologist. She opined that if the plaintiff's remaining aneurysm was anything but extremely stable, "working indeed and with physical problems is not the best choice for her with her depression and the mental deficiencies at this time related to the depression." She also opined the plaintiff was not a good candidate for retraining or rehabilitation (Tr. 138-41).

On April 24, 2003, the plaintiff presented to Dr. Walter Evans for comprehensive neurological evaluation for headaches. Mental status evaluation revealed the plaintiff had intact judgment and insight, fluent speech, and no evidence of hallucinatory or delusional behavior. Physical examination revealed a craniotomy defect on the right temple, but an otherwise symmetrical face. The plaintiff also had a stable gait, normal reflexes and no signs of weakness or atrophy. Dr. Evans diagnosed headaches, probably of multiple etiologies, including possible migraine or muscle contraction. He noted that rupture of the unclipped aneurysm and seizures were possibilities, prescribed Depakote ER and Tylenol 3, and recommended follow-up in four weeks (Tr. 194-96).

On June 5, 2003, the plaintiff presented to Dr. Shaver for lower tooth pain. He assessed gum and periodontal disease and unresolved headaches with a normal head CT. He advised follow-up with a dentist and a neurologist and prescribed antibiotics (Tr. 205-06).

On June 18, 2003, the plaintiff presented to Dr. Evans for follow-up. She reported a headache about 15 minutes after taking Depakote ER, and Dr. Evans explained that it would not be absorbed so quickly and that it was probably a coincidence. Dr. Evans noted the plaintiff's symptoms were unchanged and that her examination was stable. He also noted that a recent CT scan showed no evidence of any additional aneurysms or

9

bleeding and that her EEG was normal.  He assessed probable migraine with possible muscle contraction contribution, and he continued her medication regimen (Tr. 193).

On August 11, 2003, the plaintiff presented to Dr. Shaver with complaints of family problems.  Dr. Shaver noted the plaintiff was tearful and had little social support, but denied active thoughts of hurting herself or others.  He assessed grief and/or depression with a number of psychosocial stressors.  He referred the plaintiff to Social Services assistance and the Short Term Counseling Clinic and advised her to follow up in one week (Tr. 203-04).

On August 29, 2003, the plaintiff presented to Dr. Shaver for depression follow-up.  She reported she was feeling better but still had family difficulties, with problems sleeping and loss of interest in her normal activities.  Dr. Shaver noted the plaintiff was in no acute distress, "appeared overall well," became tearful when talking about her family, reported seeing things that others could not see, and denied any suicidal or homicidal ideations.  He assessed major depression with adjustment disorder secondary to family strife and a stable mood.  He prescribed Zoloft (an anti-depressant) (Tr. 201-02).

On September 11, 2003, the plaintiff presented to Cuong Luu, M.D., and Carol Adams Ph.D., at Short Term Counseling Clinic., where she reported ongoing family problems and depression, and some auditory and visual hallucinations.  Mental status examination revealed depressed mood and affect, the ability to present a cogent history, a normal intellectual level, and no suicidal ideations.  Drs. Luu and Adams diagnosed major depression and increased Zoloft (Tr. 217).

On October 8, 2003, the plaintiff presented to Dr. Shaver for evaluation of a dental abscess and headaches and for a Zoloft prescription.  She reported that Tylenol 3 helped her tooth pain and headaches in the past and that "she was starting to take more care of herself as far as depression was concerned."  She also reported she could not afford to have her teeth fixed.  Examination showed the plaintiff was in no acute distress,

10

and had a normal gait, intact cranial nerves and poor dentition.  Dr. Shaver diagnosed a dental abscess and depression.  He also diagnosed unresolved headaches that were "expect[ed] to improve with increased social support and dental repair."  He noted he would hold off on prescribing more Zoloft since it could be exacerbating the plaintiff's headaches (Tr. 200).

On October 14, 2003, Karen Caniano, a nurse practitioner at Pee Dee Mental Health Center, noted the plaintiff had missed appointments.  The plaintiff first reported she did not know why she missed, then said she had problems with her transportation service.  Examination showed the plaintiff was somewhat dysphoric, had good eye contact, was logical, and had no suicidal or homicidal ideations (Tr. 213).

On October 23, 2003, the plaintiff presented to Dr. Shaver requesting antibiotics for her teeth.  Dr. Shaver recommended the plaintiff be admitted to the hospital for extraction, but she refused, saying she was not ready to go to the hospital.  He assessed poor dentition and prescribed antibiotics. Dr. Shaver also noted that the plaintiff's head was atraumatic and normocephalic, that his clinic had stopped Zoloft and that the Mental Health department had stopped Paxil.  The plaintiff, therefore, was not taking any anti-depressants (Tr. 197-99).

On November 20, 2003, the plaintiff presented to Drs. Luu and Adams at Short Term Counseling Clinic.  Mental status examination at that time revealed she was fully oriented and had good insight, fair judgment, and no suicidal or homicidal ideations.  Drs. Luu and Adams diagnosed major depression and recommended she continue treatment at Pee Dee Mental Health and restart anti-depressants (Tr. 215).

On December 23, 2003, Ms. Caniano noted the plaintiff had been noncompliant in following up with her case manager and that she reported missing appointments due to problems with her transportation service.  The plaintiff reported financial and family stressors.  Ms. Caniano noted the plaintiff was "fairly animated," relaxed

11

and logical and that she denied suicidal or homicidal ideations. The plaintiff was advised to follow up with her case manager (Tr. 212).

On February 24, 2004, the plaintiff presented to neurologist Dr. Evans for consultation. He diagnosed probable migraine with possible muscle contraction, depression and history of aneurysm clipping. The plaintiff reported Depakote ER, Zoloft and Nasonex exacerbated her headaches, and that she had been experiencing crying spells. Dr. Evans noted that headaches were a possible side effect of Zoloft. He restarted the plaintiff's Paxil and prescribed other medications (Tr. 191-92).

In March 2004, the plaintiff presented to Dr. William Hill with a toothache and swollen gums. Dr. Hill noted the plaintiff did not follow up with a dentist as recommended at her last visit. Dr. Hill prescribed antibiotic and pain medications, and advised the plaintiff to gargle saltwater and follow up with a dentist (Tr. 184-86).

In April 2004, the plaintiff presented to Ms. Caniano with headache complaints. She told Ms. Caniano that she had not filled her prescriptions for her teeth because she "just hadn't gotten around to it yet." Ms. Caniano noted the plaintiff was animated in the waiting area, but less energetic and dispirited upon examination. She prescribed Paxil (Tr. 211).

On June 3, 2004, the plaintiff reported to Ms. Caniano that she "imagine[d] that the Paxil CR is working better for her," but that she had a poor appetite. Ms. Caniano noted the plaintiff was somewhat irritable but responsive, with no suicidal or homicidal ideations (Tr. 223).

On September 9, 2004, the plaintiff presented to Ms. Caniano for headache complaints. She reported Paxil CR "still help[ed]" her depression. Examination revealed the plaintiff was alert, calm and responsive, with no suicidal or homicidal ideations (Tr. 223).

On June 28, 2004, the plaintiff presented to B. Floella Shupe, a nurse practitioner with Dr. Evans, for headaches. Ms. Shupe noted that the plaintiff did not follow

up as previously advised.  She assessed probable migraine with possible muscle contraction contribution and susceptibility to heat, depression and history of aneurysm clipping (Tr. 222).

At the hearing on May 19, 2004, the plaintiff testified her problems began in 1995 when she had headaches and subsequent brain aneurysm diagnoses (Tr. 44-46). She testified that one aneurysm was repaired surgically and that another smaller one was inoperable (Tr. 45-46).  She testified that when she was released from care for the inoperable aneurysm in 1999, her doctor said it was stable (Tr. 46).  She said she recently got a second opinion from a physician who recommended it be repaired by coiling, but that she did not follow through because she "just freaked and . . . just got scared" (Tr. 47).

As to her headaches, the plaintiff testified they had worsened over the years and that she had different types of headaches (Tr. 48-49).  She said she had a tension headache every day, for which she took over-the-counter medications (Tr. 49).  She testified she got debilitating migraine headaches at least once a week, lasting two to three days, for which she said Percoset was helpful (Tr. 49-50).  She said heat and fumes exacerbated her headaches (Tr. 64).

The plaintiff testified she also suffered from depression and sometimes had auditory and visual hallucinations (Tr. 52-53, 56).  She said she attended counseling and took Paxil (Tr. 53-54).  The plaintiff testified she also had stomach problems, dizziness, fatigue, weakness and problems with her jaw and teeth (Tr. 57-58).

As to her daily activities, the plaintiff testified she cared for her young grandchild off and on from November 2001 to December 2003 (Tr. 40-43).  She said she made her bed, watched television, grocery shopped once per month and had two to three days per week where she did not dress, shower or comb her hair due to depression (Tr. 59-61).  She testified she did not have a driver's license (Tr. 62).

13

A vocational expert, Feryal Jubran, also testified at the hearing (Tr. 65-71). The ALJ presented the following hypothetical question to Ms. Jubran:

> Assume an individual who is limited to light exertional work as defined in the regulations and that's because of the latent aneurysm. And assume an individual with the Claimant's education and past job experience with restrictions which require simple routine work and this is because of her anxiety and depression; a low stress environment and that's one requiring few decisions; no more than occasional interaction with the public; occasional balancing, stooping, kneeling, crouching and crawling; no climbing; no ladders, ropes or scaffolds; the avoidance of hazards, such as unprotected heights, vibrations and dangerous machinery; an environment free from poor ventilation, dust, fumes, gases, odors, humidity, wetness and temperature extremes. Based on this profile, would there be any jobs available the individual could perform and, if so, would you provide examples of such and the approximate numbers present?

(Tr. 67). In response, Ms. Jubran testified such an individual could perform the jobs of assembler (DOT #706.684-022, light,[4] unskilled,[5] 5,090 jobs in South Carolina, 1,200,000 in the national economy); packager (DOT #753.687-038, light, unskilled, 3,740 in South Carolina, 680,000 in the national economy); inspector (DOT #727.687-062, light, unskilled, 3,100 in South Carolina, 625,000 in the national economy); assembler (DOT #726-684-110, sedentary,[6] unskilled, 2,720 in South Carolina, 688,000 in the national economy); and inspector (DOT #726.684-050, sedentary, unskilled, 1,600 in South Carolina, 355,000 in the national economy) (Tr. 67-68). In response to questions from the plaintiff's attorney,

---

[4]Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. §416.967(b). It is presumed that someone who can do light work can also do sedentary work unless there are other limiting factors such as loss of fine dexterity or inability to sit for long periods of time. *Id*.

[5]Unskilled work "is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. . . . [A] person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed." 20 C.F.R. §416.968(b).

[6]Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §416.967(a).

Ms. Jubran testified that an individual that had to miss a minimum of four days per month due to headaches would not be able to sustain employment (Tr. 69).

## ANALYSIS

The ALJ found that the plaintiff had the residual functional capacity to perform a significant range of light work. The plaintiff argues that the ALJ erred by (1) finding that the plaintiff's claims of severe residuals of chronic unrelenting headaches and severe depression were not credible; (2) failing to explain his residual functional capacity findings; and (3) failing to include all of the plaintiff's functional limitations in the hypothetical question posed to the vocational expert.

### *Credibility*

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the

evidence in the case record."  Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."  SSR 96-7p, 1996 WL 374186, *4.

In addition to the objective medical evidence, the factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

In this case, the ALJ found:

Upon review of the evidence of record, I do not find objective medical evidence to substantiate the allegations of severe residuals of chronic unrelenting headaches or severe depression.  Accordingly, I find the claimant's description of her limitations exceeds medical substantiation and is not consistent with other evidence and therefore, is not fully credible. Of particular note, she failed to keep some appointments because she was keeping her grandchild, which lasted off and on for a year.

Additionally, there have been no emergency room visits, intensive inpatient or outpatient hospital visits, no surgical intervention, no reported strength deficits, neurological deficits,

16

> atrophy, or changes in weight which are reliable indicators of
> longstanding, severe or intense pain.

(Tr. 20).

Substantial evidence does not support the ALJ's finding that the plaintiff's severe impairments could not be expected to produce the symptoms she alleged. The plaintiff's history of ongoing severe headaches (Tr. 49-51, 132-34, 136, 138-40, 142, 191, 193-194, 196, 199-200, 205-206, 208-209, 211, 213-16) and depression (Tr. 52-60, 132-340, 194-95, 198-204, 210, 213, 215-17) is well documented in the record.  As the Fourth Circuit Court of Appeals stated in *Mickles v. Shalala*, 29 F.3d 918 (4th Cir. 1994) :

> Once an underlying physical or mental impairment that could
> reasonably be expected to cause pain is shown by medically
> acceptable objective evidence, such as clinical or laboratory
> diagnostic techniques, the adjudicator must evaluate the
> disabling effects of a disability claimant's pain, even though its
> intensity or severity is shown only by subjective evidence. If an
> underlying impairment capable of producing pain is shown,
> subjective evidence of the pain can, by itself, support a finding
> of disability. Objective medical evidence of pain, its intensity or
> degree (i.e., manifestations of the functional effects of pain such
> as deteriorating nerve or muscle tissue, muscle spasm, or
> sensory or motor disruption), if available, should be obtained
> and considered. Because pain is not readily susceptible of
> objective proof, however, the absence of objective medical
> evidence of the intensity, severity, degree or functional effect of
> pain is not determinative.

*Id.* at 919-20.  Based upon the foregoing, the case should be remanded to the ALJ for an assessment of the plaintiff's credibility in accordance with the above-cited law at the second step of the pain evaluation.


**Residual Functional Capacity**

The plaintiff argues that the ALJ failed to explain how he determined her residual functional capacity (pl. brief 11-13).   The plaintiff notes that one of the State's own non-examining medical consultants found the plaintiff could only lift/carry less than 10 pounds frequently and 10 pounds occasionally (Tr. 150).  Further, an examining medical

17

consultant, Dr. Dickinson, stated that working would not be the best choice for the plaintiff due to her aneurysm, depression, and her mental deficiencies related to depression, and also stated that the plaintiff would be a poor candidate for retraining and rehabilitation (Tr. 141). Examining consultant Dr. Carraway noted that the plaintiff had major depression, frequent headaches, and a GAF score of 58[7] (Tr. 137). As part of his findings of RFC, the ALJ found that the plaintiff had mild restriction of activities of daily living and mild difficulties in maintaining social functioning (Tr. 20). Dr. Eaker, a non-examining State agency psychologist, concluded the plaintiff had "moderate" restrictions in her activities of daily living and abilities to maintain social functioning (Tr. 176). The ALJ failed to explain why he found the plaintiff could perform at the light level of exertion in view of the above evidence.

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. *The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. . . .*
>
> The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

SSR 96-8p, 1996 WL 374184, *7 (emphasis added). Accordingly, upon remand, the ALJ should be instructed to consider this evidence and explain his RFC findings in accordance with the above-cited ruling.

---

[7]A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *See Diagnostic & Statistical Manual of Mental Disorder-Text Revision* (DSM-IV-TR) (2000) (Stat!Ref Library CD-ROM, Second Quarter 2006).

18

### Hypothetical Question

The plaintiff contends that the ALJ failed to include all of her functional limitations in the hypothetical question posed to the vocational expert. The Fourth Circuit Court of Appeals has held that "[i]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of the claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The questions, however, need reflect only those impairments that are supported by the record. *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3rd Cir. 1987). The purpose of a vocational expert's testimony is to assist in determining whether jobs exist in the economy which a particular claimant could perform. *Id.* The ALJ, however, has great latitude in posing hypothetical questions and is free to accept or reject suggested restrictions, so long as there is substantial evidence to support the ultimate question. *See Martinez v. Heckler*, 807 F.2d 771, 774 (9th Cir. 1986).

The ALJ did not include the restrictions of "moderate difficulty in occupational functioning" and having to miss four days or work a month due to headaches, and he failed to explain the finding that the plaintiff was "capable of making a vocational adjustment to other work" in light of the examining medical consultant's conclusion that the plaintiff "would be a very poor candidate for retraining and rehabilitation" (Tr. 22, 141). The defendant argues that the ALJ's hypothetical "included those limitations which he found were supported by the evidence" and cites evidence from another doctor who concluded that the plaintiff was able to make necessary occupational adjustments (def. brief. 24-25, Tr. 180-83). However, post-hoc rationalizations are prohibited. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Because the evidence was not even mentioned by the ALJ, it is impossible for the court to know whether the ALJ's considered it at all. Accordingly, upon remand, the ALJ

should be directed to consider the evidence of the plaintiff's moderate difficulty in occupational functioning, that she would miss four days of work a month due to headaches, and her ability to make occupational adjustments, and he should discuss the reasons for or against including the alleged limitations in the hypothetical to the vocational expert.

The plaintiff argues that the jobs listed by the vocational expert exceed the abilities of an individual with the restrictions included by the ALJ in his hypothetical, much less the actual limitations the plaintiff possesses.  The Dictionary of Occupational Titles' ("DOT") general educational development descriptions for the three jobs cited by the vocational expert require Level 2 in Reasoning, and the packager job has a requirement of Level 2 in Mathematics.  The plaintiff argues that these requirements clearly exceed her abilities given her education and intellectual functioning and, further, that they exceed the ALJ's restrictions in his hypothetical as she would be able to handle only those jobs with a Level 1 Reasoning requirement (pl. brief 14-15).

Social Security Ruling 00-4p provides in pertinent part:

When a VE . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT. In these situations, the adjudicator will:

Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and

If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

SSR 00-4p, 2000 WL 1898704, *3.  Upon remand, the ALJ should be instructed to obtain vocational expert testimony to explain this apparent conflict in accordance with the above-cited ruling.

Lastly, the plaintiff argues that she should have been found disabled under the Medical-Vocational Guidelines ("Grids"), specifically Rule 201.09, as she was only three

20

months away from turning 50 years old.  The defendant points out that the rule cited by the plaintiff corresponds to a person limited to sedentary work.  Upon remand and further proceedings, the ALJ should be instructed to consider the application of this rule to the plaintiff.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe
United States Magistrate Judge

December 5, 2006

Greenville, South Carolina

21